**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**John O. Enright**
**Mark R. Sylvester**
**Lindsay S. Moilanen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0159 (Sylvester)**
**sylvesterm@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**ERIC J. WATSON, OLIVER-BARRET LINDSAY, and GANNON GIGUIERE,**<br><br>**Defendants.** | **COMPLAINT**<br><br>**21 Civ. _____ ( )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Eric J. Watson ("Watson"), Oliver-Barret Lindsay ("Lindsay"), and Gannon Giguiere ("Giguiere") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1. This matter involves an insider trading scheme conducted in late 2017, in which Watson, a corporate insider and the controlling shareholder of Long Island Iced Tea Corp. (now known as Long Blockchain Corp.) (hereinafter, "LTEA"), tipped his friend, business associate, and

broker, Lindsay, with material nonpublic information regarding LTEA's impending announcement that it was significantly changing its business from soft drink manufacture to blockchain technology (the "Announcement"). At the time, LTEA's shares were publicly traded on NASDAQ.

2. On December 20, 2017, Lindsay conveyed this material nonpublic information regarding the impending Announcement to Giguiere, his friend and co-conspirator in prior market manipulation schemes. Within hours of receiving this confidential information, Giguiere purchased 35,000 LTEA shares.

3. On the following day, December 21, 2017, LTEA issued the Announcement, stating that LTEA was "shifting its primary corporate focus towards the exploration of and investment in opportunities that leverage the benefits of blockchain technology" compared to "the ready-to-drink segment of the beverage industry," as well as changing its name to "Long Blockchain Corp." in place of "Long Island Iced Tea Corp."

4. As a result of the Announcement, the company's stock price and trading volume skyrocketed, with the intraday stock price spiking 388%, on increased trading volume of 1,000%, before closing at $6.91, an increase of more than 180% from the prior day's closing price.

5. In less than two hours following the Announcement, Giguiere sold the 35,000 LTEA shares he had purchased the day before, realizing $162,500 in illicit profits.

**VIOLATIONS**

6. By virtue of the foregoing conduct and as alleged further herein, Defendants Watson, Lindsay, and Giguiere have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1(a)].

9. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; (b) ordering Defendants to disgorge their ill-gotten gains with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and (d) permanently prohibiting Watson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that at all relevant times, LTEA shares traded on NASDAQ, which is located in New York, New York.

## DEFENDANTS

13. **Watson**, age 60, is a New Zealand citizen and believed to be a resident of London, United Kingdom. Watson has never been registered with the Commission and holds no securities licenses. At all relevant times, Watson controlled over 30% of the shares of LTEA, personally and through companies he controlled.

14. In 2001, the Commission issued settled administrative proceedings against Watson for violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with his insider trading in McCollam Printers, Ltd., a publicly traded New Zealand-based issuer.[1]

15. **Lindsay**, age 44, is a Canadian citizen and resident of Vancouver, British Columbia, Canada. Lindsay has never been registered with the Commission and he holds no U.S. securities licenses. At all relevant times, Lindsay was the principal of CMGT Capital Management, a Cayman Islands-exempt broker-dealer registered with the Cayman Islands Monetary Authority.

16. On July 16, 2018, Lindsay was charged, along with Giguiere, by the Commission with violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for his role in a manipulative trading scheme.[2] *See SEC v. Giguiere, et al.*, No. 18-cv-01530 (S.D. Cal.) ("*SEC v. Giguiere*"). At the same time, Lindsay was criminally charged for the same conduct. *See United States v. Giguiere, et al.*, No. 18-cr-03071 (S.D. Cal.) ("*U.S. v. Giguiere*"). On July 23, 2019, Lindsay pleaded guilty to one count of conspiracy to commit securities fraud. Both cases are currently pending in the United States District Court for the Southern District of California.

---

[1] *See* Order Instituting Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, Securities Exchange Act of 1934 Release No. 44934 (Oct. 15, 2001), available at https://www.sec.gov/litigation/admin/34-44934.htm.

[2] Penny stocks, also known as "microcaps," are not listed on a national securities exchange such as NASDAQ; they instead trade over the counter at prices below $5 and are typically issued by companies with little to no revenue or assets.

17. **Giguiere**, age 47, resides in Newport Coast, California. Giguiere has never been registered with the Commission and he holds no securities licenses. At all relevant times, Giguiere owned and operated TheMoneyStreet.com ("TMS"), a stock promotion website.

18. On July 16, 2018, Giguiere was charged, along with Lindsay, by the Commission with violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for his role in two fraudulent schemes. *See SEC v. Giguiere*. At the same time, he was charged criminally for the same conduct. *See U.S. v. Giguiere*. On August 1, 2019, Giguiere pleaded guilty to one count of conspiracy to commit securities fraud. Both cases are currently pending in the United States District Court for the Southern District of California.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

19. **LTEA** is a Delaware corporation with a principal place of business in Farmingdale, New York. Until the Commission revoked its registration on February 19, 2021, LTEA was a reporting company with a class of securities registered under Section 12(g) of the Exchange Act.[3] LTEA's common stock traded on NASDAQ from approximately July 2016 to April 2018, when NASDAQ delisted LTEA for making "a series of public statements designed to mislead investors and to take advantage of the general investor interest in bitcoin and blockchain technology."

20. **Company A** is a New Zealand company with a principal place of business in London, England. In late 2017, according to materials prepared by Company A, it was "a holding company with interests in various financial services" including a foreign exchange brokerage, and it was purportedly "developing proprietary Blockchain technology" and "developing . . . a Blockchain enabled platform."

---

[3] *See* Order Instituting Proceedings Pursuant to Section 12(j) of the Securities Exchange Act of 1934, Making Findings, and Revoking Registration of Securities, Exchange Act Release No. 91174 (Feb. 19, 2021), available at https://www.sec.gov/litigation/admin/2021/34-91174.pdf.

21. **Individual A**, age 55, resides in Carmel, California. At all relevant times, he was a microcap stock promoter who participated and, while acting as a confidential source to law enforcement, purported to participate in stock promotion schemes with Lindsay and Giguiere.

22. **Individual B**, age 25, resides in New York, New York. He is Watson's son. Individual B has never been registered with the Commission and holds no securities licenses. At all relevant times, he was a consultant for Company A.

## FACTS

### I. DEFENDANTS' RELATIONSHIP PRIOR TO THE ANNOUNCEMENT

23. Prior to, and concurrent with, the insider trading scheme alleged herein, Giguiere and Lindsay engaged in other fraudulent schemes together.

24. As alleged in the Commission's complaint in *SEC v. Giguiere*, Giguiere and Lindsay engaged together in "pump-and-dump" schemes to defraud investors in microcap securities.

25. Specifically, in the fall of 2017, Giguiere and Lindsay received shares of Kelvin Medical, Inc. ("KVMD"), engaged in matched trades to increase the price of KVMD shares from $0.00 to $1.37, and caused KVMD to issue press releases in order to further increase the price of shares, intending to quickly sell their shares into the market.

26. In and around 2017, Lindsay's business model included organizing shell companies, finding suitable public companies for reverse mergers, executing reverse mergers with the shell companies, providing financing, and working with management on corporate development and news releases and other promotional efforts.

27. Lindsay coordinated the new company's press releases and, at the same time, accumulated the company's stock and arranged for stock promotion. Through this process, Lindsay profited from the sale of stock, frequently at the expense of unsuspecting retail investors.

28. Lindsay traveled frequently to manage and grow relationships in connection with these efforts.

29. At all relevant times, Watson was a friend and business associate, and also a brokerage client, of Lindsay's.

30. In November 2017, shortly before the trading at issue here, Lindsay and Watson met in Miami in person for dinner.

31. At around this time, Lindsay was an LTEA shareholder.

32. Throughout late 2017, Lindsay and Watson exchanged frequent messages and calls, using an encrypted call and messaging application. Among other things, they discussed Watson's plans for LTEA; the possibility of Company A, a company to which Watson had several ties, completing an initial public offering; and the promotion of another microcap issuer in which Watson held a controlling interest.

33. In or about September 2017, Watson sought to use Lindsay's connections within the microcap industry to promote LTEA.

34. Shortly thereafter, Lindsay introduced Watson to Giguiere for the purpose of promoting LTEA on TMS.

35. Giguiere used the TMS website for stock promotion, including in connection with "pump and dump" schemes.

36. Giguiere agreed to promote LTEA through TMS but did very little promotion because he was instructed to pause any promotional efforts during the period that LTEA was considering and then preparing for its purported shift to blockchain technology.

37. Lindsay served as the conduit for communication between Watson and Giguiere.

38. Giguiere was aware of Watson's and Lindsay's relationship, and understood Watson was an LTEA corporate insider. For example, on December 4, 2017, Lindsay told Giguiere, "Spoke

to Eric [Watson] this morning about canceling the spending on LTEA b/c company is in a quiet period right now b/c of S-1. Eric [Watson] put the deal together; he's a client of mine."

39. Lindsay, Giguiere, and Individual A exchanged numerous phone calls and text messages during the period of October 2017 through December 2017. These three had a group text thread on an encrypted messaging application, labeled "Daily Updates," in which they discussed their daily trading plans in various stocks. They also frequently discussed Lindsay's conversations with Watson regarding LTEA. They used the encrypted messaging application to conceal their messages from governmental authorities.

## II. WATSON PLANNED AND EXECUTED LTEA'S PURPORTED "PIVOT" TO BLOCKCHAIN

40. LTEA was formed in May 2015 through a merger between Long Island Brand Beverages and Cullen Agricultural Corp., a company owned and controlled by Watson.

41. Prior to the Announcement, LTEA was principally engaged in the production and distribution of premium, non-alcoholic, ready-to-drink beverages.

42. In September 2017, Watson controlled more than 30% of LTEA's common stock.

43. At that time, Watson suggested to the Chairman of LTEA's Board of Directors that the company shift its business from soft drink production to any of a number of possible other businesses, including blockchain-related ventures.

44. Watson continued his pitch and, by December 2017, he had convinced the company to "pivot" from soft drink manufacture to blockchain-related business.

45. On December 4, 2017, LTEA met with Company A, which, according to Watson, was seeking to enter the blockchain space. Watson introduced Company A to LTEA.

46. Watson had a number of ties to Company A at this time. Company A had been incorporated in New Zealand by a friend of Watson a few months earlier, and Individual B, Watson's son, was a consultant for Company A.

47. On December 5, 2017, Company A and LTEA entered into a confidentiality agreement. This agreement included a provision forbidding Company A from disclosing any confidential information without the written consent of LTEA and forbidding Company A from engaging in securities transactions involving the securities of LTEA while in possession of confidential information. As of at least December 9, 2017, Watson was aware of the existence of this agreement between Company A and LTEA.

48. On December 7, 2017, Individual B sent a written proposal outlining the steps LTEA should take to "[r]efocus . . . in the blockchain technology/digital asset markets" to two LTEA board members, Watson, and others.

49. On the same day, LTEA purchased the domain name www.longblockchain.com.

50. On December 11, 2017, LTEA entered into a consulting agreement with an individual to assist in evaluating blockchain opportunities.

51. On December 18, 2017, LTEA and Watson entered into a Confidentiality Agreement governing Watson's treatment of LTEA's confidential information, including "all information whether of a technical, business or other nature . . . that is or may be disclosed" by LTEA to Watson, including "all information concerning . . . product launches or offerings." Per this Confidentiality Agreement, Watson was prohibited from disclosing any of LTEA's information without LTEA's prior written consent. He was further prohibited from engaging in "any transaction involving the securities of [LTEA] while in possession of any Confidential Information."

52. On December 19, 2017, Watson and Individual B, Watson's son, met with LTEA to discuss Individual B's purported expertise in blockchain. On the same day, LTEA's Board of Directors approved changing the company's name to Long Blockchain Corp.

53. On December 21, 2017, LTEA issued the Announcement, calling its shift to blockchain technology a "once-in-a-generation opportunity."

## III. WATSON OWED A DUTY TO LTEA AND ITS SHAREHOLDERS TO REFRAIN FROM USING LTEA'S INFORMATION FOR HIS PERSONAL BENEFIT

54. As a corporate insider and the controlling shareholder of LTEA, Watson had a fiduciary and other relationship of trust and confidence with LTEA and its shareholders that obligated him not to disclose or trade on LTEA's information for his personal benefit.

55. In addition, Watson had a duty of trust and confidence not to disclose or trade on LTEA's information for his personal benefit based on his Confidentiality Agreement with LTEA, which forbade him from disclosing any of LTEA's confidential information without LTEA's prior written consent and from engaging in transactions involving LTEA's securities when in possession of LTEA's confidential information.

## IV. WATSON TIPPED LINDSAY WITH MATERIAL NONPUBLIC INFORMATION REGARDING THE IMPENDING ANNOUNCEMENT, AND LINDSAY CONVEYED THIS INFORMATION TO GIGUIERE PRIOR TO THE ANNOUNCEMENT

56. Throughout the events leading up to the Announcement, Defendants continuously communicated about LTEA and its business prospects, including Watson's ongoing and ultimately successful efforts to convince LTEA's management to shift its business from soft drink manufacturing to blockchain technology.

57. On December 4, 2017, the same day that LTEA met with Company A, the New Zealand company purportedly seeking to enter the blockchain space, Lindsay told Giguiere and Individual A that he had been "trying to reach the guy behind the deal on Long Island Iced Tea all weekend, and he finally called me back this morning." Lindsay later specified that the individual he spoke to that morning who was the source of Lindsay's information about LTEA was "Eric" [Watson], and again described Watson as "the guy who put the deal together."

58. On the same day, Lindsay told Giguiere and Individual A that Watson told Lindsay that "[t]hey may announce an agreement with a blockchain deal." Lindsay, Giguiere, and Individual

A further discussed that, in light of this possible impending announcement, any "spend" on TMS's promotion of LTEA should be paused.

59. On December 5, 2017, Lindsay called Individual A and informed him that LTEA planned to go through with the blockchain deal and planned to make an announcement to that effect the following week. Individual A told Lindsay that he would tell Giguiere that LTEA had decided to pursue the deal.

60. Later that day, Individual A sent a message to Giguiere using an encrypted messaging application, copying Lindsay, and stating: "LTEA is going to move fed [sic] with block chain deal."

61. The next day, Lindsay, Giguiere, and Individual A chatted via an encrypted messaging application about LTEA's strategy and focus on blockchain.

62. On December 7, 2017, the same day that LTEA purchased a domain name reflecting its planned name change to "Long Blockchain Corp.," Lindsay sent to Giguiere, via encrypted email, a PowerPoint presentation regarding Company A.

63. On December 11, 2017, the same day that LTEA entered into a consulting agreement to evaluate blockchain opportunities, Lindsay called Individual A and reported that Lindsay had spoken to Watson that day and requested an LTEA shareholder list, that Lindsay was considering "buy[ing] some more stock while it's down here, while were are waiting for this other stuff to materialize," and that Watson was continuing to work with the company to get the blockchain deal to "materialize."

64. Lindsay explained to Individual A that he had requested the LTEA shareholder list because it would prove Watson had control over the LTEA, which would make Lindsay more confident about the merits of purchasing additional LTEA shares. Later in the call, Lindsay confirmed that he had received the shareholder list from Watson.

65. On December 16, 2017, Watson sent Lindsay a slide deck called "[Company A] Blockchain Strategy Deck [Initials of Individual B]" via an encrypted messaging application. Lindsay forwarded this slide deck to an acquaintance who was a microcap stock promoter unaffiliated with Giguiere or TMS.

66. The following day, Watson messaged Lindsay, expressing his confidence that LTEA was going forward with his proposed "pivot" to blockchain technology, stating that "Tea WILL be BC."

67. On December 18, 2017, Watson entered into the Confidentiality Agreement, which, among other things, prohibited him from sharing any information he acquired from LTEA without LTEA's prior written consent. Watson never received any written consent from LTEA to share its information with Lindsay.

68. Starting the next day, December 19, 2017, Watson began sharing various drafts of the Announcement with Lindsay.

69. At approximately 8:00 p.m. on December 19, 2017, Watson sent to Lindsay via encrypted messaging application a draft of the Announcement entitled (with brackets in original), "Long Island Iced Tea Corp. Changing Name to [Long BlockChain Corp.], Shifts Strategic Direction Towards Opportunities in Blockchain Technologies." This draft Announcement explained that that "[t]he primary focus of the Company will now be the exploration of and investment into opportunities that leverage the benefits of blockchain technology."

70. Just before midnight on December 19, 2017, Watson sent to Lindsay, via encrypted messaging application, a revised draft version of the Announcement. A few hours later, Lindsay forwarded, via encrypted messaging application, this draft version to a colleague with whom he worked.

71. On the morning of the following day, December 20, 2017, Individual B, Watson's son, sent the final draft version of the Announcement to Watson. This version of the Announcement was the one ultimately issued the next day.

72. Watson thereafter sent the final version of the Announcement to Lindsay via encrypted messaging application, and wrote "Smiling?"

73. Lindsay replied to Watson: "Laughing . . . good job getting that done." Watson then replied: "When the market sees the [Company A] deal we may have a $50 stock." LTEA's closing price on that day was $2.44.

74. After receiving the final version of the Announcement from Watson on December 20, 2017, Lindsay sent it via encrypted messaging application to Giguiere and Individual A. By this time, Lindsay had been telling Giguiere and Individual A for weeks that LTEA would announce its "pivot" to the blockchain business and expected that the recipients of this material nonpublic information would use it to trade with the expectation that the Announcement would cause a spike in LTEA's share price.

75. On the same day, Lindsay sent a message via encrypted messaging application to approximately six individuals that "LTEA is coming back."

76. Giguiere read the Announcement he received from Lindsay, commenting to Lindsay and Individual A that they would need to be "mindful" regarding TMS's promotion of LTEA because "the regulators are scrutinizing Block an[d] Crypto deals that are being promoted right now."

77. Giguiere then asked Lindsay whether LTEA was making the Announcement that day, and Lindsay replied: "Should be now . . . Or post market . . . I guess we will know shortly." A couple of hours later, Lindsay updated Giguiere on the timing of the Announcement, stating: "He's working on releasing . . . With legal."

78. Within hours of receiving Lindsay's message, Giguiere placed two market orders to buy a total of 35,000 LTEA shares, which were executed at an average cost of $2.42 per share.

## V. LTEA MADE THE ANNOUNCEMENT AND GIGUIERE REAPED ILLEGAL PROFITS

79. On December 21, 2017, at 8:32 am, LTEA issued the Announcement, stating that it was "shifting its primary corporate focus toward the exploration of and investment in opportunities that leverage the benefits of blockchain technology," and that, in connection with this purported strategic shift, LTEA was changing its name to Long Blockchain Corp.

80. As a result of the Announcement, LTEA's trading volume and share price skyrocketed. LTEA's trading volume that day was over 15 million shares, whereas its historical average volume was about 125,000 shares. LTEA's closing price per share that day was $6.91, an increase of $4.47, or approximately 183%, from the previous day's closing price of $2.44.

81. Less than two hours after the Announcement, Giguiere sold the 35,000 shares of LTEA he had purchased the previous day, realizing $162,500 in illicit profits. On the same day, Lindsay's business associate asked Lindsay via an encrypted chat message why Lindsay did not tell him to buy LTEA prior to the Announcement. Lindsay replied: "I think I told everyone."

## VI. WATSON, LINDSAY, AND GIGUIERE VIOLATED THE FEDERAL SECURITIES LAWS

### A. THE INFORMATION REGARDING LTEA'S IMPENDING ANNOUNCEMENT WAS MATERIAL AND NONPUBLIC

82. The information that Watson tipped Lindsay, and that Lindsay then shared with Giguiere, regarding LTEA's impending Announcement was material because there is a substantial likelihood a reasonable investor would consider the information important in deciding whether to purchase or sell LTEA securities.

83. The information that Watson tipped Lindsay, and that Lindsay then shared with Giguiere, regarding LTEA's impending Announcement was nonpublic because, prior to the Announcement, it was not broadly disseminated generally to the investing public.

84. That a reasonable investor would consider the information Watson tipped to be material—and that prior to the Announcement, the information was nonpublic—is demonstrated by, among other things, the dramatic increase in LTEA's trading volume and share price immediately following the Announcement.

### B. WATSON VIOLATED THE FEDERAL SECURITIES LAWS BY TIPPING LINDSAY WITH MATERIAL NONPUBLIC INFORMATION

85. By tipping Lindsay with material nonpublic information regarding LTEA's impending Announcement, Watson breached the duty he owed LTEA and its shareholders as a corporate insider and controlling shareholder and as a signatory to the Confidentiality Agreement.

86. Watson obtained a personal benefit from tipping Lindsay, including a pecuniary gain or a reputational benefit that will translate into future earnings. For example, Lindsay had located and was liaising with a promotor for LTEA securities at Watson's request. Watson also obtained a personal benefit by making a gift of confidential information to his friend Lindsay.

87. Watson knew, consciously avoided knowing, or was reckless in not knowing that the information regarding LTEA's impending Announcement that he tipped to Lindsay was material and nonpublic. Indeed, it was Watson who had such a powerful sway over LTEA that he was able to execute his plan to cause the company to change its entire business line from soft drink production to blockchain technology, and he appreciated the magnitude of such a change.

88. Watson also knew, consciously avoided knowing, or was reckless in not knowing that trading in LTEA's securities would result from his disclosure of information regarding LTEA's impending Announcement.

### C. LINDSAY VIOLATED THE FEDERAL SECURITIES LAWS BY SHARING THIS INFORMATION WITH GIGUIERE

89. Lindsay knew, consciously avoided knowing, was reckless in not knowing, or should have known that the information had been divulged to him in breach of a duty of trust and confidence for personal benefit Lindsay was aware of Watson's role at LTEA, and was of course aware of his business and social relationship with Watson. Lindsay's communications with Giguiere also show Lindsay's awareness of the information's confidential nature.

90. Lindsay disclosed information regarding LTEA's impending Announcement to Giguiere, despite Lindsay knowing, consciously avoiding knowing, or being reckless in not knowing that this information was material and nonpublic. Lindsay's communications with Watson and Giguiere show Lindsay's awareness of the information's sensitive nature.

### D. GIGUIERE VIOLATED THE FEDERAL SECURITIES LAWS BY TRADING ON THE BASIS OF MATERIAL NONPUBLIC INFORMATION

91. Giguiere knew, consciously avoided knowing, was reckless in not knowing, or should have known that the information he received had been divulged in breach of a duty of trust and confidence for personal benefit. Giguiere understood from Lindsay that the identity of the source of the information was Watson, that Watson was an LTEA corporate insider, and the nature of Lindsay's and Watson's professional and personal relationship. Indeed, Giguiere was aware that Watson and Lindsay were business associates, and specifically that Lindsay wanted to help Watson achieve pecuniary and reputational benefits through Giguiere's help in promoting LTEA on TMS, Giguiere's stock promotion website, and through Giguiere's connections in the microcap industry. Giguiere also knew that Watson and Lindsay were friends.

92. Giguiere traded on the basis of the information regarding LTEA's impending Announcement, despite knowing, consciously avoiding knowing, or being reckless in not knowing that this information was material and nonpublic. Among other things, the size, nature, and timing

of Giguiere's purchases of LTEA's shares after Lindsay disclosed to him information about the impending Announcement demonstrate Giguiere's awareness of that information's material and nonpublic nature.

**CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

93. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 92.

94. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

95. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Permanently prohibiting Watson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
July 9, 2021

/s/ Richard R. Best
RICHARD R. BEST
REGIONAL DIRECTOR
Sanjay Wadhwa
Sheldon L. Pollock
John O. Enright
Mark R. Sylvester
Lindsay S. Moilanen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place

200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0159 (Sylvester)
sylvesterm@sec.gov