USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/7/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

              Plaintiff,

-against-

ERIC J. WATSON, OLIVER-BARRET LINDSAY, and GANNON GIGUIERE

              Defendants.

21-cv-05923 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, United States District Judge:**

The Plaintiff, the Securities and Exchange Commission ("Plaintiff" or the "Commission"), brings this insider trading action against Defendant Gannon Giguiere, ("Giguiere" or the "Defendant"), Eric J. Watson[1] ("Watson"), and Oliver-Barret Lindsay ("Lindsay"). The Commission alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against all three Defendants. Defendant Giguiere now moves to dismiss the sole count asserted against him by the Commission pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim. Defendant argues that the Complaint does not adequately allege the elements of tippee liability. For the following reasons, Defendant's Motion is **DENIED.**

**BACKGROUND**

**I.    Procedural Background**

On July 9, 2021, the Commission filed the Complaint. ECF No. 1. The Complaint alleges that all Defendants, including Defendant Giguiere, violated Sections 10(b) and Rule 10b-5 of the

---

[1] On February 3, 2023, the Clerk of the Court entered a Certificate of Default as to Defendant Watson after he failed to file a response to the Complaint. ECF No. 48.

1

Exchange Act. Following multiple extension requests to respond to the Complaint, *see* ECF Nos. 13, 15, 17, 23, 32, Defendant filed a pre-motion conference letter seeking leave to file a motion to dismiss. ECF No. 34. Plaintiff filed a letter opposing the merits of the pre-motion conference letter but did not object to Defendant's request to file the motion. ECF No. 35. On August 16, 2022, the Court granted Defendant leave to file the instant motion to dismiss and approved the parties' proposed briefing schedule. ECF No. 39.

Defendant Giguiere filed his motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), ECF No. 40, and supporting memorandum on August 29, 2022 ("Mot."). ECF No. 41. Plaintiff filed its opposition on October 14, 2022 ("Opp."). ECF Nos. 43. The Defendant's reply was filed on November 4, 2022 (Reply). ECF No. 44. The motion is deemed fully briefed. After careful consideration, Defendant's motion to dismiss is **DENIED.**

## II.     Factual Background

The following facts are taken from the allegations contained in Plaintiff's Complaint, which are presumed to be true for purposes of this motion to dismiss.

Defendant Giguiere is a stock promoter who owned a website called TheMoneyStreet.com ("TMS"). Giguiere used TMS for stock promotion, including in connection with "pump-and-dump" schemes. Compl. ¶¶ 17, 33-35. Watson is a New Zealand citizen and believed to be a resident of London, United Kingdom. *Id.* ¶13. Watson controlled 30% of Long Island Iced Tea Corp.'s ("LTEA") common stock and was an LTEA insider. *Id*. ¶¶ 13, 38. Lindsay is a Canadian citizen and resident of Vancouver, British Columbia, Canada who was the principal of CMGT Capital Management, a Cayman Islands-exempt broker-dealer registered with the Cayman Islands Monetary Authority. *Id*. ¶ 15. LTEA is a Delaware corporation with a principal place of business in Farmingdale, New York. *Id*. ¶ 19. Until the Commission revoked its registration on February

19, 2021, LTEA was a reporting company with a class of securities registered under Section 12(g) of the Exchange Act. *Id*. LTEA's common stock traded on NASDAQ from approximately July 2016 to April 2018, when NASDAQ delisted LTEA for making "a series of public statements designed to mislead investors and to take advantage of the general investor interest in bitcoin and blockchain technology." *Id*. Individual A resides in Carmel, California. *Id*. ¶ 21. Individual A was a microcap stock promoter who participated and, while acting as a confidential source to law enforcement, purported to participate in stock promotion schemes with Lindsay and Giguiere. *Id*. Company A is a New Zealand company with a principal place of business in London, England. *Id*. ¶20.  In late 2017, according to materials prepared by Company A, it was "a holding company with interests in various financial services" including a foreign exchange brokerage, and it was purportedly "developing proprietary Blockchain technology" and "developing . . . a Blockchain enabled platform." *Id*.

Plaintiff alleges that Watson and Lindsay were friends and business associates. *Id*. ¶1, 29, 91. Lindsay acted as Watson's broker and the two spent the fall of 2017 in frequent conversation by encrypted messages and phone. *Id*. ¶¶ 29, 32. In those conversations, they discussed many topics including Watson's interest in and promotional plans for LTEA, and his plan that it shift its business focus from soft drink production to any of a number of possible other businesses, including blockchain technology. *Id*. ¶¶ 32, 41-43. They also discussed another issuer that Watson controlled whose stock he also wanted to promote. *Id*. ¶ 32.

In the early fall of 2017, when Watson sought Lindsay's help in promoting LTEA, Lindsay introduced him to Defendant Giguiere. *Id*. ¶ 34. Plaintiff asserts that Lindsay recommended Giguiere because the two were already engaged in promoting, and allegedly manipulating the market for, the stock of a different penny stock issuer, Kelvin Medical, Inc. *Id*. ¶¶ 24-25. Giguiere

3

agreed to use his TMS website to promote LTEA, and he relied solely on Lindsay for his communications with Watson. *Id*. ¶ 36, 37. But he did very little actual promotion because on December 4, 2017, Lindsay told Giguiere that Watson had told him that Watson was "canceling the spending on LTEA [because] company in a quiet period right now [because] of S-1." *Id*. ¶¶ 36, 38.

That same day, Lindsay also told Giguiere that Watson had told him that Watson was pushing LTEA to shift its business plan to blockchain and that LTEA "may announce an agreement with a blockchain deal." *Id*. ¶ 58. Lindsay, Giguiere, and a confederate (Individual A) discussed that the promotion efforts should also be paused pending the possibility of such an announcement. *Id*. Plaintiff alleges that between December 4 and December 20, Watson kept Lindsay posted on the progress of his efforts to engineer LTEA's shift to a focus on blockchain, and Lindsay passed on those conversations to Giguiere, either by phone or encrypted messaging applications. *Id*. ¶¶ 39, 59-77.

On December 18, 2017, Watson executed a confidentiality agreement with LTEA by which he agreed not to disclose LTEA's confidential information, including "all information whether of a technical, business or other nature" to anyone without LTEA's prior written consent. *Id*. ¶ 51. Nonetheless, on December 19, and again on December 20, Watson forwarded to Lindsay drafts of the announcement of LTEA's blockchain pivot, and Lindsay forwarded them to Giguiere soon after. *Id*. ¶¶ 69-74. In sending the final draft, Watson punctuated the significance of the news, telling Lindsay: "When the market sees the [Company A] deal we may have a $50 stock." *Id.* ¶ 73. LTEA's closing price on December 20, 2017 was $2.44. *Id*.

When Lindsay sent Giguiere the final draft of the LTEA press release that Watson had sent him, Giguiere asked Lindsay when it was going to be issued. *Id*. ¶ 77. Lindsay responded a few

hours later that its release was imminent, and that Watson had told him that Watson was "working on releasing . . . With legal." *Id*. Within hours of receiving Lindsay's message, Giguiere placed two market orders to buy a total of 35,000 LTEA shares, which were executed at an average cost of $2.42 per share. *Id*. ¶ 78. When the announcement was released the next morning pre-market, the stock rose throughout the day, closing on December 21 at $6.91 a share. *Id*. ¶ 80. Giguiere sold his LTEA shares less than two hours after the announcement's release, realizing $162,500 in profits. *Id*. ¶ 81.

## LEGAL STANDARD

### I. Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a

5

trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## II. Pleading Standard for Insider Trading

Insider trading claims are subject to Rule 9(b) of the Federal Rules of Civil Procedure, which requires that circumstances constituting fraud be stated "with particularity." *S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 296 F.R.D. 241, 248 (S.D.N.Y. 2013). "But because insider tips are typically passed on in secret, Rule 9(b) is somewhat relaxed, allowing plaintiff to plead certain facts on information and belief." *Sec. & Exch. Comm'n v. Yin*, No. 17-CV-972 (JPO), 2018 WL 1582649, at *2 (S.D.N.Y. Mar. 27, 2018). Specifically, plaintiffs may plead facts that imply the content and circumstances of an insider tip if those facts are peculiarly within the knowledge of defendant or the tipper. *Onyx*, 26 F.R.D. at 248 (collecting cases). Still, "[w]hile the rule is relaxed as to matters peculiarly within the adverse parties' knowledge, [ ] allegations [on information and belief] must then be accompanied by a statement of the facts upon which the belief is founded." *Yin*, 2018 WL 1582649, at*2 (quoting *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972)).

"In sum, to state an insider trading claim, the SEC must make particular factual allegations supporting a reasonable inference that the defendants violated Section 10(b) and Rule 10b–5." *Yin*, 2018 WL 1582649, at 3. If facts about the content or circumstances of an insider tip are known only to the defendant and the insider, the SEC may plead a belief about the tip coupled with particular facts supporting that belief. *Id.* The SEC's allegations must strongly support an inference that the defendant acted with intent to defraud. *Onyx*, 296 F.R.D. at 248–49.

**DISCUSSION**

Plaintiff brings claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against Defendant Giguiere. Defendant argues that the Complaint does not allege with particularity that (1) Watson received any personal benefit from his disclosure of information to Lindsay or that (2) Mr. Giguiere knew or should have known that Watson breached his fiduciary duty to LTEA when Watson disclosed the information to Lindsay. The Court will address each argument in turn.

I. **Insider Trading and Tippee Liability**

There are two ways one can be liable for insider trading under Section 10(b) of the Exchange Act and Rule 10b-5: the classical theory and the misappropriation theory. The classical theory covers corporate insiders who trade using material non-public information about the company, in violation of the duty of trust and confidence owed to the company's shareholders. *See Chiarella v. United States*, 445 U.S. 222, 230 (1980). The misappropriation theory is somewhat broader, and includes outsiders who misappropriate confidential information, for trading purposes, in breach of a duty to the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 652–53 (1997). The core difference between the two theories is the source of the duty. Under the classical theory, the duty is owed to the corporation; under the misappropriation theory, the duty is owed to the source of the information.

Both theories extend liability to "tippees": a person who did not themselves owe a duty to anyone but traded based on an insider tip from someone else. *See Dirks v. S.E.C.*, 463 U.S. 646, 660 (1983). A tippee is liable only if (1) the tipper themselves breached a duty by tipping, and (2) the tippee knew or should have known of that breach. *Id.* at 660 & n.19.

The test for whether the tipper breached a duty by tipping "is whether the [tipper] personally will benefit, directly or indirectly, from his disclosure" of confidential information to

7

the tippee. *Id.* at 662; *see also United States v. Martoma*, 894 F.3d 64, 73–74 (2d Cir. 2017). The Supreme Court has "defined personal benefit broadly." *Martoma*, 894 F.3d at 73.

*Dirks* set forth numerous examples of personal benefits that prove the tipper's breach: a "pecuniary gain," a "reputational benefit that will translate into future earning," a "relationship between the insider and the recipient that suggests a *quid pro quo* from the latter," the tipper's "intention to benefit the particular recipient," and a "gift of confidential information to a trading relative or friend" where "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Dirks*, 463 U.S. at 663–64. The tipper's personal benefit need not be pecuniary in nature. *See Salman v. United States*, 137 S.Ct. 420, 428 (2016).

While the insider who personally benefits from disclosing confidential information breaches their duty, "the insider who discloses for a legitimate corporate purpose does not." *Martoma*, 894 F.3d at 74; *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 298 (S.D.N.Y. 2018) (a personal benefit is "grounded in using company information for personal advantage, as opposed to a corporate or otherwise permissible purpose (such as whistleblowing)").

A. **The Complaint Adequately Alleges Personal Benefit**

Defendant's main contention is that Plaintiff's Complaint fails to allege a personal benefit to Watson. Because Watson is alleged to have disclosed the confidential information, the Complaint must first allege that he breached a duty by tipping. As explained above, the Court must apply the personal benefit test to determine if the tipper breached his duty. Defendant argues that there was a legitimate business purpose for Watson sharing the information, and therefore Watson did not breach his fiduciary duty. Mot. at 8-9; Reply at 4-5. The Court disagrees with Defendant.

Defendant argues that the Complaint cannot plausibly allege that Watson obtained a personal benefit from tipping because Lindsay located and was liaising with Giguiere two months

before Watson tipped Lindsay and that stock promotion is a legitimate business purpose. Mot. at 8-9. Specifically, Defendant asserts that in December 2017, Watson shared the "pivot" plans and impending announcement with Lindsay to explain his decision to shut down the stock promotion, and therefore this disclosure was for a legitimate corporate purpose. *Id*.

The Complaint, however, does not allege that Watson shared the "pivot" plans and impeding announcement to explain his decision to shut down promotion. As Plaintiff points out, the Complaint does not ascribe this explanation to Watson. Opp. at 10.

The Complaint alleges that Watson told Lindsay that he was "canceling the spending on LTEA b/c company is in a quiet period right now b/c of S-1." Compl. ¶ 38. The Complaint goes on to allege that, after Watson told Lindsay about the pivot plans in early December, Lindsay and Giguiere (and Individual A) concluded that the decision to pause the stock promotion was attributable to the company's possible shift in direction. *Id*. ¶ 58. Additionally, the Complaint also alleges that Defendant Giguiere was instructed to pause any promotional efforts while LTEA was considering and then preparing for its purported shift to blockchain technology. *Id*. ¶ 38. Lindsay, "who served as the middleman between Giguiere and Watson," was the one who instructed Giguiere to pause the promotional efforts—not Watson. Reply at 5.

Furthermore, even if the Complaint alleged that Watson told Lindsay that he wanted to pause the stock promotion because of the impending "pivot" announcement, and even if this constituted a valid business purpose, Watson would have no legitimate business purpose in keeping Lindsay appraised of the ongoing company discussions about the "pivot." As explained in the Complaint, Watson allegedly communicated, via call and encrypted messages, with Lindsay at least four times throughout December with updates on his alleged endeavor to shift LTEA's business model from soft drink production to block-chain technology. Compl. ¶¶ 63, 65, 66, 69.

Finally, the Court notes that the Complaint alleges that Watson signed a Confidentiality Agreement with LTEA on December 18 that prohibited him from sharing any information about the company with anyone without LTEA's prior written consent, and there is no allegation Watson obtained such consent to disclose the pivot plan information. *Id.* ¶ 51. Therefore, the Complaint adequately alleges that there was no legitimate business purpose in Watson sharing confidential information with Lindsay.

The Complaint alleges that Watson intended to make a gift to Lindsay out of friendship. Defendant asserts that the Complaint only includes "threadbare allegations" that Lindsay and Watson were friends, and that the Complaint has failed to demonstrate that there was a "meaningfully close personal relationship" between Watson and Lindsay, which is required to show a personal benefit in the form of a "gift of confidential information to a trading relative or friend." Reply at 5-6 (quoting *Martoma,* 894 F.3d at 68). This meaningfully close personal relationship requirement was introduced by the Second Circuit in *United States v. Newman*, 773 F.3d 438, 452 (2d Cir. 2014), abrogated by *Salman v. United States*, 137 S. Ct. 420 (2016).

In *Martoma*, the Second Circuit defined "the very narrow application" of this meaningfully close personal relationship requirement. *Pinto-Thomaz*, 352 F. Supp. 3d at 300 (citing *Martoma*, 894 F.3d 64). The *Martoma* Court emphasized that *Newman* held that this concept "requires evidence of a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the [latter]." *Martoma*, 894 F.3d at 77 (quoting *Newman*, 773 F.3d at 452). Therefore, either a *quid pro quo* relationship or an intention of conferring a benefit suffices to show a personal benefit.

Here, the Court agrees that the Complaint sufficiently alleges that Lindsay and Watson are friends and that Watson intended to make a gift to Lindsay out of friendship. Compl. ¶¶ 29, 32,

10

86. Even if these allegations did not suffice to establish a friendship, the Complaint also sufficiently alleges that that Watson gave Lindsay the tip as a *quid pro quo* for Lindsay's past, continuing, and future services and that Watson intended that Lindsay trade on the tip for profit.

In addition to the allegations that Watson and Lindsay were friends and business associates, and that Watson was a client of Lindsay's off-shore brokerage firm, *id*. ¶ 29, the Complaint also alleges that Lindsay was providing services for Watson and that the two were discussing future promotional services Lindsay might provide for another company that Watson controlled. *Id*. ¶¶ 32, 33. This demonstrates that Watson was tipping Lindsay in compensation for those efforts. The Complaint further alleges that Watson and Lindsay had a conversation where Watson indicates the company stock will dramatically increase after the disclosed announcement takes place. *Id*. ¶ 71-73. This demonstrates that Watson intended to benefit Lindsay by providing him this information so that he could trade stock.

Finally, although Lindsay did not trade on the information given by Watson, "insider trading liability may also apply to a "chain" of tippers and tippees." *Sec. & Exch. Comm'n v. Waldman*, 407 F. Supp. 3d 299, 306 (S.D.N.Y. 2019) (citing *Sec. & Exch. Comm'n v. Obus*, 693 F.3d 276, 288 (2d Cir. 2012).

Therefore, the Complaint alleges sufficient facts to confer a personal benefit on Watson. The Court now turns to the second element of tippee liability.

### B. The Complaint Adequately Alleges the Second Element of Tippee Liability

To state a claim against a tippee, the Commission must allege that he "know[s] or ha[s] reason to know that the information was obtained through a breach and trade while in knowing possession of the information." *Waldman*, 407 F. Supp. 3d at 306. Defendant argues that the

11

Complaint insufficiently alleges that he knew or should have known that Lindsay obtained the information from an insider breaching his fiduciary duty. Mot. at 11; Reply at 8-9.

However, the Complaint alleges that Lindsay told Giguiere that Watson was an insider. Compl. ¶¶ 38, 57. The Complaint also alleges that Lindsay told Giguiere that his source was "working on releasing" the announcement with LTEA's "legal," demonstrating that the source, previously identified as Eric [Watson], was in fact an insider. *Id*. ¶ 77. Furthermore, Lindsay shared internal documents with Giguiere that could only have originated from inside LTEA or Company A, with which LTEA was discussing the potential pivot. *Id*. ¶¶ 62, 74. When Lindsay conveyed to Giguiere that the pivot announcement was being finalized for imminent release on December 20, 2017, Giguiere knew or should have known that Watson was conveying information in breach of his fiduciary duty because there was no business reason why Giguiere needed to know this information. Therefore, the Complaint's allegation lead to the plausible inference that Giguiere knew or should have known that Lindsay obtained the information from an insider breaching his duty. Thus, the Complaint "provide[s] enough information such that, stepping back, the Court can see a comprehensible picture of insider trading." *Yin*, 2018 WL 1582649, at *3-4 (quotations omitted).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **DENIED**. The Clerk of the Court is respectfully directed to terminate ECF No. 40.

Additionally, Plaintiff is **ORDERED** to provide a status report on the current status of this action by **March 14, 2023**. The Plaintiff is directed to specifically explain the status of the other Defendants.

**SO ORDERED.**

Dated:    **March 7, 2023**
           **New York, New York**

                                            **ANDREW L. CARTER, JR.**
                                            **United States District Judge**